IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SPECTRUM SYSTEMS, INC. )<br>    Plaintiff / Counter-Defendant, )<br>v. )<br> )<br>JOSEPH ENG )<br> )<br>    Defendant / Counter-Plaintiff. ) | Case No. 08 C 6647<br><br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiff Spectrum Systems, Inc. ("Spectrum") filed this suit against Defendant Joseph Eng ("Eng") alleging that Eng breached his employment contract with Spectrum, and seeking damages arising from the alleged breach as well as a declaratory judgment that Spectrum does not owe Eng any additional compensation. Eng filed a Counterclaim seeking a judgment for damages in the amount of unpaid post-separation compensation, in the form of shares of Spectrum's profits, allegedly due under his employment agreement. Eng now moves for summary judgment on both the Complaint and his Counterclaim. For the reasons set forth below, Eng's Motion for Summary Judgment is granted as to both Counts of Spectrum's Complaint and as to his Counterclaim; however, his request for attorneys' fees is denied.

## STATEMENT OF UNDISPUTED FACTS[1]

Spectrum, an information technology firm, is incorporated and headquartered in Illinois. (Pl. 56.1 Resp. ¶ 1.) Spectrum had approximately eight clients at the time that Eng joined the company, and has provided services to approximately fifteen clients during its existence. (Pl. 56.1 Resp. ¶ 24.)

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements as follows: citations to exhibits supporting Eng's Statement of Uncontested Facts have been abbreviated to "Def. 56.1 Ex. __."; Spectrum's Response to Eng's Statement of Uncontested Facts have been abbreviated to "Pl. 56.1 Resp. ¶ __."; and citations to Eng's Response to Spectrum's Statement of Additional Facts have been abbreviated to "Def. 56.1 Resp. ¶ __."

Eng is an executive who served from August 2006 through February 2008 as Spectrum's President and CEO. (Pl. 56.1 Resp. ¶¶ 17, 36.) Prior to his tenure at Spectrum, from 1999 through 2006 Eng was the Chief Information Officer for SWIFT, a communication enterprise serving the financial services industry. (Pl. 56.1 Resp. ¶¶ 7, 9.) SWIFT is Spectrum's largest client. (Def. 56.1 Resp. ¶ 1.) In 2005, Eng was interviewed by the SWIFT Board of Directors for SWIFT's Chief Executive Officer position, but was not offered that position. (Def. 56.1 Resp. ¶ 2.)

In November 2005, Eng began discussions with Spectrum's principals,[2] Vit Kantor ("Kantor") and Yuri Rabinovitch ("Rabinovitch"), about a possible move to Spectrum. (Pl. 56.1 Resp. ¶ 8; Def. 56.1 Resp. ¶ 3.) Kantor and Rabinovitch told Eng that Spectrum needed someone for "business development." (Def. 56.1 Resp. ¶ 3.) Kantor engaged in a series of positive emails with Eng about the possibility of Eng joining Spectrum, and presented Eng with at least one personal gift during the course of the ongoing discussions. (Pl. 56.1 Resp. ¶¶ 10-12.)

Eng's subsequent resignation from SWIFT was dated May 22, 2006, and stated that Eng planned to take "some extended time to be with his family and have a long summer vacation." (Pl. 56.1 Resp. ¶ 22.) On July 24, 2006, Rabinovitch sent Eng an email with detailed information about Spectrum's 2005 revenues and profits attached. (Pl. 56.1 Resp. ¶ 13.) On August 24, 2006, Rabinovitch sent a written agreement (the "2006 Agreement") via email to Eng confirming the parties' prior discussions concerning Eng's employment with Spectrum. (Pl. 56.1 Resp. ¶ 17.) The 2006 Agreement, which had been drafted by Kantor and Rabinovitch with comments from Eng, included provisions regarding Eng's title, responsibilities, and compensation, and was signed by

---

[2] Neither party clearly identifies Kantor and Rabinovitch's roles in Spectrum prior to or after Eng's tenure with any clarity in their Rule 56.1 statements. The agreement between Spectrum and Eng provided that Rabinovitch and Kantor would be Spectrum's Managing Partners. (*See* Def. 56.1 Ex. C.)

Kantor and Rabinovitch. (Pl. 56.1 Resp. ¶¶ 15-17.) Eng did not sign the 2006 Agreement but does not now dispute its contractual validity and enforceability. (Pl. 56.1 Resp. ¶ 21.)

With respect to Eng's job responsibilities, the 2006 Agreement provided that Eng would be President and CEO of Spectrum, that he would become a partner in the company, and that his primary role would be to generate new business for Spectrum, provide guidance, and serve as the "public face" of the company. (Pl. 56.1 Resp. ¶ 22.) The 2006 Agreement also stated that Eng would decide "how much he works, when he takes a vacation and what are the best activities for him to undertake to reach" the agreed-upon goals. (Pl. 56.1 Resp. ¶ 22.) To his knowledge, Eng was the first executive hired by Spectrum. (Def. 56.1 Resp. ¶ 11.)

As to Eng's compensation, the 2006 Agreement provided that Eng would receive an annual salary of $90,000. (Def. 56.1 Resp. ¶ 6.) The 2006 Agreement further provided that while Eng was with Spectrum, he would receive a share of the company's profits gradually stepping up from 1/54th of the profits during his first month to 18/54ths of the profits after 18 months. (Def. 56.1 Resp. ¶ 7.) At the end of Eng's time with Spectrum, his share of the profits would decrease by 1/54th each month until reaching zero. (Def. 56.1 Resp. ¶ 8.) The "step-up" and "step-down" formulas were intended to be mirror images of each other. (Def. 56.1 Resp. ¶ 9.) Pursuant to the 2006 Agreement, Eng was paid a regular salary and a share of Spectrum's profits, increasing according to the step-up formula described above, from August of 2006 through the end of September of 2007. (Def. 56.1 Resp. ¶ 10.)

Eng has referred to his role at Spectrum prior to October 2007 as a full-time one; however, he devoted fewer than forty hours per week to the position. (Def. 56.1 Resp. ¶¶ 12, 14.) While working as Spectrum's President and CEO, Eng was also on the advisory boards of two other

companies and was actively involved with family real estate and insurance businesses. (Def. 56.1 Resp. ¶ 13.) However, acting on Spectrum's behalf during this time period, Eng communicated with a number of individuals at other corporations; at least some of those contacts are documented as including discussion of potential new business for Spectrum. (Pl. 56.1 Resp. ¶ 25.) From August 2006 through July 2007, Eng contacted approximately a dozen potential customers. (Def. 56.1 Resp. ¶ 22.) Eng traveled on at least two occasions to meet potential clients. (Pl. 56.1 Resp. ¶ 31.) Eng also arranged meetings between himself, Kantor, and at least two other potential clients. (Pl. 56.1 Resp. ¶ 28.) Due at least in part to Eng's work, two new clients—Lockheed Martin (a multibillion dollar company) and Act3Tech—began using Spectrum's services during Eng's time at Spectrum. (Pl. 56.1 Resp. ¶¶ 26-27.)

In his role as Spectrum's "public face," Eng directed Spectrum to send out public announcements about staff achievements (including, if not exclusively, his own) and drafted an announcement of his receipt of the "CIO Award" in November 2006 in order to have the announcement posted on Spectrum's website. (Pl. 56.1 Resp. ¶¶ 23, 30; Def. 56.1 Ex. 1-E.) Eng also suggested changes to Spectrum's website and marketing literature. (Pl. 56.1 Resp. ¶ 29.) In his advisory and guidance-providing capacity, Eng participated in numerous telephone conversations with Rabinovitch and Kantor about Spectrum's business strategies. (Pl. 56.1 Resp. ¶ 31.)

On July 30, 2007, Eng emailed Kantor and Rabinovitch suggesting that he move to "more of an advisor[y] role" and that he was "not comfortable with what [he was] doing and the compensation relative to how that impacts [Spectrum] from a financial perspective." (Def. 56.1 Resp. ¶ 24.) Eng felt both that he had exhausted his best leads for potential business for Spectrum and that he needed to focus on certain family and health issues. (Def. 56.1 Resp. ¶ 25.) In October

4

2007, Kantor, Eng, and Rabinovitch sent a series of emails resulting in Eng's reduction of his involvement with Spectrum to an advisory role (the "2007 Agreement"). (Pl. 56.1 Resp. ¶¶ 33-34.) The parties agreed that Eng's compensation would change to a total of $2,500 per month during the time that his duties were purely advisory, regardless of Spectrum's profits during that period. (Pl. 56.1 Resp. ¶ 34; Def. 56.1 Resp. ¶ 29.) Eng retained his title of President and CEO. (Pl. 56.1 ¶ 36.) Kantor stated to Eng that Spectrum would thereafter "leave it up to [him] to decide how often [he] need[ed] to touch base" during the advisory period and that once a month would do "if nothing special comes up". (Def. 56.1 Resp. ¶ 27.) The 2007 Agreement did not specifically set an end date for the advisory period, nor did it include any provisions regarding post-separation payments. (Def. 56.1 Ex. G.)

Although the parties had apparently contemplated that the advisory period would end at the end of 2007, Eng wrote to Kantor and Rabinovitch on December 13, 2007 and stated that the timing was not right for him to consider returning to a full-time position with Spectrum. (Def. 56.1 Resp. ¶ 31.) Pursuant to this understanding, Eng was paid $2,500 per month from October 2007 until his resignation from Spectrum in February 2008, and was not paid any share of the company profits during that period. (Pl. 56.1 Resp. ¶¶ 34, 36; Def. 56.1 Resp. ¶ 30.)

In February 2008, Eng voluntarily resigned from his position as Spectrum's President and CEO and accepted an executive position with JetBlue airlines. (Pl. 56.1 Resp. ¶ 36; Def. 56.1 Resp. ¶ 33.) On February 23, 2008, Kantor sent an email to Eng stating that Kantor and Rabinovitch "appreciate[d] very much the time and efforts" he had spent on Spectrum's behalf and that they knew "that the company and both of us have benefit[t]ed as a result." (Pl. 56.1 Resp. ¶ 37.) On February 26, 2008, Eng emailed Kantor and Rabinovitch asking "how do we want to handle the post-

5

employment pay agreement aspects . . . ." (Pl. 56.1 Resp. ¶ 38; Def. 56.1 Ex. 1-I.) Rabinovitch responded that day with an email denying that Eng was entitled to any severance payments and stating that Rabinovitch and Kantor believed they had "fulfilled our financial and other obligations to you completely . . . ." (Pl. 56.1 Resp. ¶ 39; Def. 56.1 Ex. 1-J.) Eng had been paid a total of $163,183 for his time at Spectrum. (Def. 56.1 Resp. ¶ 30.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.P 56(c). When determining if a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

# DISCUSSION

## I. Eng's Motion to Strike

As an initial matter, Eng's Motion to Strike Spectrum's Additional Statement of Facts in Response to Eng's Statement of Facts is granted in part and denied in part as detailed in this section. Eng argues that certain of Spectrum's proposed additional facts are without adequate evidentiary basis and that others contain multiple purported facts in violation of the rules therefore exceeding the maximum permissible number. With leave of the Court, Spectrum filed a corrected addendum to its statement of facts that supplied certain deposition testimony that was not attached to its original filings, thereby curing at least two of the evidentiary problems identified in Eng's Motion to Strike by providing a basis for proposed facts 4 and 34.

Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. *See, e.g., Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 WL 1102272, at *8 (N.D. Ill. Apr. 29, 2004) (St. Eve, J.) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1). The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon*, 233 F.3d at 527) ("Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."). "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

Eng challenges proposed additional facts 4, 17, 19, 21, 28, 34, and 35 as improper on evidentiary grounds or otherwise. As noted above, Spectrum corrected its filing by providing supporting materials for facts 4 and 34 with leave of the Court. The Motion to Strike is therefore denied as to those facts.

As to fact 17, most clauses of the proposed statement of fact were within the personal knowledge of Kantor, whose deposition is offered to support them; specifically the statements that Act3 engaged Spectrum to provide personal management assistance, that Spectrum invoiced Act3 $40,000 for that work, and that only $10,000 was paid. The other portions of fact 17, specifically that Act3 acknowledged that the work had been properly performed and that the partial payment was due to lack of funds, are not supported by the cited page of Kantor's deposition. The Motion to Strike is therefore granted as to those two points.

Similarly, the portion of proposed additional fact 19 that states that Eng had no involvement or assistance in the addition of three named clients to Spectrum's roster is not clearly supported by the cited pages of Kantor's deposition, which only states at best that initial contact was made with those clients without Eng's involvement. The Motion to Strike is therefore granted in that respect. Eng moves to strike the last sentence of proposed additional fact 28 on the grounds that it is an incomplete reflection of Rabinovitch's deposition testimony. The only word missing from the quoted excerpt, however, is "money," which is not material in the context. The Motion to Strike is therefore denied as to fact 28.

Proposed additional fact 21 assumes that Eng made a certain number of phone calls during his tenure and per week, but no evidence is provided for those numbers other than the self-serving affidavits of Kantor and Rabinovitch. The proposed fact is speculative and irrelevant, and therefore

stricken. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir.2006) (rule 56.1 statements that contain "irrelevant information, legal arguments, and conjecture" do not comply with the Rule and are properly stricken). Proposed additional fact 35 states a legal conclusion that is for this Court's determination, not a factual matter, and is in any event unhelpful and not adequately based in the record. The Motion to Strike is therefore granted as to proposed additional fact 35. *See id.*

Eng's Motion to Strike also seeks to strike those additional proposed statements of fact which, he asserts, comprise several different facts combined into one numbered paragraph. Eng correctly notes that combining numerous facts into one paragraph is unhelpful and tends to be confusing, and may be considered a violation of the Rule. *See, e.g., Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). Upon reviewing Eng's response to the multi-fact paragraphs at issue here, however, the Court concludes that the paragraphs to which Eng points each addressed a single subject, and that Eng's ability to respond in specific detail to each discrete fact in a given numbered statement does not appear to have been impaired. Thus, the Court will not exercise its discretion to strike those paragraphs from Spectrum's statement of proposed additional facts.

## II. Eng's Alleged Breach of the 2006 Employment Agreement

In Count I of its Complaint, seeking damages for breach of the 2006 Agreement,[3] Spectrum alleges that Eng breached the Agreement's terms by failing "to devote sufficient time and effort to

---

[3] Spectrum's claim for damages apparently seeks to recover the entire sum that it paid to Eng over the course of his employment with Spectrum. However, Spectrum has presented no legal or factual argument that Eng breached his obligations under the 2007 Agreement, under which he acted in an "advisory" capacity. Spectrum's arguments focus solely on Eng's alleged breaches of the 2006 Agreement and make no claims that Eng failed to abide by the terms of the 2007 "advisory capacity agreement." Thus, Spectrum has provided no basis upon which a reasonable jury could find that it is entitled to recover damages for Eng's conduct following the change in the parties' relationship in October 2007. (The exact nature and legal ramifications of that change will be discussed in greater detail below.) The Court will therefore consider only whether Eng has shown that he is entitled to summary judgment on the issue of whether he breached the 2006 Agreement, as Spectrum has waived any argument regarding an alleged breach of the 2007 Agreement.

9

develop new customers for Spectrum" and failing "to adequately perform his employment duties with Spectrum." (Compl. ¶ 19.) Spectrum further alleges that as a result of this breach, Spectrum is entitled to recover the money that it paid to Eng over the course of his employment with Spectrum, and that it is not required to pay any additional compensation, including any portion of Spectrum's profits pursuant to the step-down post-termination provisions of the 2006 Agreement. Eng responds that under the terms of the contract, he was not bound to any particular time commitment or business-generation quota, and thus cannot be held liable for breaching the contract simply because he did not succeed in attracting as much business to Spectrum as the parties hoped he would.

To recover on its claim for breach of contract, Spectrum must prove four elements: "'(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. 1st Dist. 2004)).[4] The parties agree that the 2006 Agreement constituted an enforceable contract between the parties, notwithstanding Eng's failure to sign the final document memorializing the terms of the Agreement. *See Pratt Central Ltd. P'ship v. Dames & Moore, Inc.*, 60 F.3d 350, 360 (7th Cir. 1995) (signature not required, under Illinois law, to create a binding agreement between parties to a contract who have manifested their assent through other acts or conduct). The parties also apparently agree that Spectrum substantially performed its duties under the contract, in that Spectrum compensated Eng in accordance with the 2006 Agreement until the 2007 Agreement took effect.

---

[4] The parties do not dispute that substantive Illinois contract law applies to this action.

In order to determine whether Eng breached the terms of the 2006 Agreement, the Court must first discern the meaning of those terms. First, "clear and unambiguous terms in a contract are given their ordinary and natural meaning." *Interim Health Care of N. Ill., Inc. v. Interim Health Care Inc.*, 225 F.3d 876, 879 (7th Cir. 2000) (collecting cases). Whether a written contract is ambiguous or unambiguous is a matter of law for the Court's determination. *See Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998). A contract is not rendered ambiguous simply because of a disagreement between the parties about the meaning of particular contractual provisions. *See Interim Health Care Inc.*, 225 F.3d at 879. Instead, ambiguity arises only if language of the contract is reasonably or fairly susceptible of more than one construction. *See id.* The contract is to be construed as a whole, with meaning given to each provision. *Emergency Med. Care, Inc. v. Marion Mem'l Hosp.*, 94 F.3d 1059, 1061 (7th Cir. 1996).

Here, the parties entered into an employment agreement providing that Eng would decide "how much he works, when he takes a vacation, and what are the best activities for him to undertake to reach our common goal[.]" (Def. 56.1 Ex. C.) Under the 2006 Agreement, Eng's primary role was "to generate new business for the company, and otherwise provide guidance and serve as the company's 'public face.'" (*Id.*) Although the 2006 Agreement contains specific provisions regarding Eng's compensation, it does not contain any specific quotas related to the amount of business that Eng was expected to bring into the company, nor does it provide that Eng was required to work on a full-time schedule or that he was not allowed to have substantial outside commitments during his tenure as Spectrum's CEO. Because the clear and unambiguous terms of the contract thus give Eng discretion to determine his working hours, his schedule, and the scope of his activities on Spectrum's behalf, and are not susceptible to an interpretation under which Eng was required to work a certain

11

number of hours or bring in a certain amount of business, extrinsic evidence is not admissible to vary the clear meaning of the 2006 Agreement's terms. *See Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 632 (7th Cir. 2004). Thus, Spectrum's argument that the parties had envisioned a much greater effort on Eng's part, or a much greater reward in the form of new business for Spectrum, cannot serve to vary the terms of the 2006 Agreement as written.

The undisputed facts in the record here demonstrate that Eng did not breach those terms. He worked to solicit new business for Spectrum, including reaching out to his contacts at other corporations and traveling to meet potential clients. His efforts were successful in bringing in at least two new clients. He suggested changes to Spectrum's website and marketing literature, and provided advice to Kantor and Rabinovitch about Spectrum's business strategies. He thus worked actively to fulfill his only specific obligations, that is, to generate new business, provide guidance, and serve as the company's public face. The 2006 Agreement required him to do no more. While not dispositive, it is telling that Kantor and Rabinovitch did not have complaints with the quality or quantity of Eng's work on Spectrum's behalf during his tenure as the company's President and CEO and even stated after Eng's resignation that they were appreciative of his time and efforts and that Eng's work had benefitted the company.[5]

In light of the evidence in the record, therefore, no reasonable jury could find that Eng breached the clear and unambiguous terms of the 2006 Agreement; Spectrum's disappointment in the results of his tenure at the company does not suffice to create a genuine issue of material fact that

---

[5] Eng argues that Spectrum's failure to terminate his contract on grounds of dissatisfaction with his performance, or even to complain about the alleged inadequacy of his performance, waived Spectrum's right to bring a breach of contract action. However, in light of the Court's determination that there is no evidence to support that such a breach occurred, the Court need not decide whether Spectrum's failure to act constituted a waiver of its claim.

would support its breach of contract claim. Eng's Motion for Summary Judgment is therefore granted as to Count I of Spectrum's Complaint.

### III. Spectrum's Claim for Declaratory Relief and Eng's Counterclaim

In Count II of its Complaint, Spectrum seeks a declaratory judgment that Spectrum does not owe Eng any post-termination compensation, including a share of Spectrum's profits as provided by the "step-down" provisions of the 2006 Agreement. Eng's Counterclaim seeks a judgment that Spectrum breached the 2006 Agreement by failing to pay him the post-severance profit shares to which he was entitled.

In support of its claim, Spectrum argues that the October 2007 Agreement between the parties, pursuant to which Eng moved to an "advisory role" and a fixed salary of $2,500 per month, constituted a termination of the 2006 Agreement between the parties and the creation of an entirely new employment relationship under which Eng was not entitled to any post-termination shares of Spectrum's profits. Eng argues that the 2007 Agreement was a modification of the existing employment contract that affected only his monthly compensation and did not cancel the post-separation provisions of the 2006 Agreement.[6] The core of the parties' disagreement, therefore,

---

[6] Eng argued in his Motion for Summary Judgment that the parties "agreed to a partial modification" of the 2006 Agreement with respect to the changes in Eng's salary and that the 2007 emails qualified under Illinois law as a contractual modification that changed only Eng's "monthly compensation and thus was not inconsistent with the severance agreement and did not have an effect on its terms." (R. 27 at 13.) In his Reply Brief in support of the Motion, Eng argued that the 2007 Agreement was not a modification at all, because the changes in his role and the scope of his work "were contemplated by his written contract from day one" and the change in his salary was voluntary, temporary, and self-initiated. (R. 42 at 6-7.) Moreover, he argues that the Agreement could not have been modified by the 2007 emails because "Eng received no consideration for his offer to receive reduced compensation." (R. 42 at 10.)

Arguments raised for the first time in summary judgment reply briefs are waived. *See Commonwealth Edison v. U.S. Nuclear Regulatory Comm'n*, 830 F.2d 610, 621 n.7 (7th Cir. 1987); *see also Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Intern. Inc.*, 616 F. Supp. 2d 805, 831 (N.D. Ill. 2009) (same). Thus, the Court will not consider the non-modification and lack of consideration arguments, but only consider whether as a matter of law the 2007 Agreement was a partial modification of the 2006 Agreement that left the post-separation "step-down" provisions intact.

involves the legal effect of the 2007 agreement that Eng would move to an "advisory role." That is, Eng's Motion for Summary Judgment requires the Court to determine whether the 2007 Agreement constituted a modification of the 2006 Agreement or a recision of the 2006 Agreement and the creation of an entirely a new contract.

As noted above, the parties agree that the 2006 Agreement was an enforceable contract. Under the plain and unambiguous terms of the compensation provisions of the 2006 Agreement, Eng earned a share of 1/54th of Spectrum's profits for each month that the Agreement was in place, up to a maximum of 18/54ths of the profits. The parties abided by these terms from August 2006 through September 2007, for a total of thirteen months, meaning that Eng was entitled to a share of 9/54ths of the company's profits in September 2007. (*See* Def. 56.1 Ex. F.)

As a general rule, "whether a contract has been modified is a question of fact . . . ." *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 852 (7th Cir. 2005). The factual question to be determined is whether the contract has changed in one or more respects, but remained the same in its general purpose and effect. *Internat'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998). "A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance." *Id.* Here, both parties agreed to the terms of the 2007 Agreement and acted thereafter as if it governed their relationship until the time of Eng's departure from the company.

The undisputed facts here show that this is exactly what occurred. The 2007 Agreement changed certain specific terms of the 2006 Agreement, namely, that Eng would receive only a monthly salary in lieu of an annual salary combined with a profit share and that he would be required to check in periodically rather than work in a more-or-less full time capacity. The 2007 Agreement

14

did not alter Eng's title, however, and did not alter the general aims of the 2006 Agreement, namely that Eng would serve as Spectrum's public face, utilize his contacts to direct new business to Spectrum, and generally provide guidance to the company.

Moreover, the communications between the parties both before and after 2007 Agreement reveal that the parties did not intend for it to be a permanent replacement of the 2006 Agreement and its terms, but only a temporary alteration in the parties' relationship. For example, Eng wrote in December of 2007 not that he did not want to return to a more significant position with the company, and not that he intended never to do so, but only that it was not the right time for him to do so at that point. In contrast, Spectrum argues that the parties utterly abandoned the 2006 Agreement. "[T]he circumstances or conduct relied on must be positive, unequivocal and inconsistent with the existence of a contract to warrant a finding of abandonment." *Sohaey v. Van Cura*, 607 N.E.2d 253, 266 (Ill. App. Ct. 1992). No such circumstances are present here; rather, every relevant undisputed fact in the record reflects the parties' intention that Eng would temporarily, not permanently, move to an advisory relationship with a different compensation plan and time commitment. There is therefore no basis for a reasonable jury to find that the 2006 Agreement was abandoned in all of its particulars.

Because the contract modification represented by the 2007 Agreement did not specifically alter or rescind the provision of the 2006 Agreement entitling Eng to post-separation profit shares in a "step down" formula mirroring the "step up" formula used at the beginning of Eng's employment, Eng's Motion for Summary Judgment as to Count II of the Complaint and his Counterclaim for such post-separation payments is granted. However, his attorney's calculation of the amount of post-severance profit shares is unsupported by his legal argument in one respect. Specifically, Eng has provided no support for his claim to a 17/54th profit share starting point for

his post-severance "step down" calculation. It is undisputed that he did not receive any profit share during the advisory period term, which began thirteen months (from August 2006 through September 2007) after he began to receive profit shares under the 2006 Agreement. No provision of the 2007 Agreement entitles him to an increasing profit share during the October 2007-mid-February 2008 advisory period; indeed, the specific terms of the 2007 Agreement are that he would receive only a fixed salary and no profit share, increasing or otherwise, during that period. That is, the fractional profit share to which Eng was entitled did not increase after he consented to the terms of the 2007 Agreement. There is therefore no basis for Eng's claim that his fractional profit share increased during the advisory period such that his post-separation payment schedule would begin at a 17/54th profit share rather than a 13/54th profit share. In order to allow Eng to present corrected calculations in light of the Court's conclusion on this issue, the Court will not enter judgment at this time. Eng is directed to file, within fourteen days of the date of this Order, corrected calculations of his post-separation profit shares, beginning with a fractional share of 13/54ths as of the date of his resignation and decreasing (according to the terms of the 2006 Agreement) thereafter.

**IV. Eng's Entitlement to Attorneys' Fees Pursuant to the Attorneys Fees in Wage Actions Act**

Finally, Eng argues that he is due attorneys' fees pursuant to the Attorneys Fees in Wage Actions Act, 705 ILCS 225/0.01 *et seq*. ("Fee Act"), which allows for the recovery of such fees after a successful "action for wages earned and due and owing according to the terms of the employment." Spectrum disputes that the severance payments at issue, which represent shares of Spectrum's profits, are "wages" within the meaning of the Fee Act.

First, the record reflects that Eng "sufficiently complied with the statute's written demand requirement." *Catania v. Local 4250/5050 of Commc's Workers of Am.*, 834 N.E.2d 966, 974 (Ill.

16

App. Ct. 2005). A letter from Eng's attorney to Spectrum making a demand in the amount of $75,000 was filed as Exhibit I to Eng's Rule 56 Statement; the letter was sent nearly a month before the filing of Eng's Counterclaim seeking post-severance payments and asks for an amount less than that to which Eng is entitled under the 2006 Agreement. *See Caruso v. Bd. of Trs. of Public Sch. Teachers' Pension & Ret. Fund of Chi.*, 473 N.E.2d 417, 420 (Ill. App. Ct. 1984).

Thus, if the post-severance shares of profits can be deemed wages, Eng would be entitled to attorneys' fees for his successful Counterclaim. However, the definition of "wages" under the Fee Act "must be considered in derogation of the common law and . . . strictly construed." *Id.* Eng correctly states that the long-standing rule deems severance pay to constitute wages under the Fee Act where such pay is included as a term of an employment agreement. *See Metro. Distributors, Inc. v. Ill. Dep't of Labor*, 449 N.E.2d 1000, 1003-04 (Ill. App. Ct. 1983) (collecting cases). Spectrum is also correct, however, in stating that bonuses (or, analogously, severance payments) that represent shares of corporate profits are not wages under the Fee Act. *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 419 F.3d 594, 597 (7th Cir. 2005). In light of the mandate that the Fee Act be strictly construed, and given the controlling nature of *Brandon*'s holding that profit shares are not wages, the Court finds the latter position more persuasive. Profit shares, which are variable by their very nature, are not of the same quality as fixed wages or contractual severance payments which could be fairly deemed "due and owing" at a particular time. Indeed, if Spectrum had for any reason made no profit after Eng's departure, he would inarguably be due no profits at all. Eng's request for attorneys' fees under the Fee Act is therefore denied.

## CONCLUSION AND ORDER

Eng's Motion for Summary Judgment is granted as to both Counts of Spectrum's Complaint and as to his Counterclaim; however, the Court will not enter judgment until presented with corrected calculations of Eng's damages as described in this Order. Eng's request for attorneys' fees is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 1, 2010